IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | 4:05-CR-0161-BLW |
| Plaintiff, | ) | |
| vs. | ) | **ORDER** |
| RAYMOND EUGENE CHASTEN, | ) | |
| Defendant. | ) | |

Defendant has filed a motion (#63) on October 4, 2006, seeking a judgment of acquittal pursuant to Fed. R. Crim. P. 29(c) and alternatively seeking a new trial pursuant to Fed. R. Crim. P. 33. Defendant also moves for arrest of judgment under Fed. R. Crim. P. 34. The Government responded (#65) to the motions and Defendant filed a reply (#66).

The standard for consideration of a Fed. R. Crim. P. 29(c) motion is whether the evidence was sufficient to establish guilt beyond a reasonable doubt. In resolving the motion, the Court does not assess the credibility of witnesses or weigh the evidence. The role of the Court is simply to decide whether evidence viewed in a light most favorable to the Government was sufficient to establish guilt beyond a reasonable doubt. The test is whether any rational juror could find the essential elements of the crime charged beyond a reasonable doubt.

The Rule 29(c) motion is not difficult to decide in this case. Viewing the evidence in a light most favorable to the Government the essential elements of each of the crimes charged in the indictment were proved beyond a reasonable doubt.  Our discussion below respecting various issues in the case explains what the essential elements were and where relevant or explanation is needed why we reach this conclusion.

### **Motion for Arrest of Judgment**

Fed. R. Crim. P. 34(a) provides that a court must arrest judgment if:

> (1)  the indictment or information does not charge an offense; or
>
> (2)  the court does not have jurisdiction of the charged offense.

Defendant's motion is based on the claim that the two counts of the Indictment are multiplicious, i.e. that the Indictment charges a single offense in more than one count.

The test for multiplicity is whether each count requires proof of an additional fact which the other does not, absent a clear indication of contrary legislative intent.  In this case there is no showing of a contrary legislative intent.  In the analysis here the court examines the elements of the offenses alone, rather than the way they are charged in the Indictment.

Here, the facts needed to be proved for each of the counts are completely different.  The essential elements of each of the offenses are:

2

(A)   <u>Count One: Wire Fraud</u>.  18 U.S.C. § 1343

    (1)   Scheme to defraud;

    (2)   Use of wire in furtherance of the scheme;

    (3)   Specific intent to deceive or defraud.

(B)   <u>Count 2: Receipt, possession, or concealment of stolen property that has crossed a state line</u>.  18 U.S.C. § 2315

    (1)   Receiving, possessing, or concealing property;

    (2)   The property was stolen or unlawfully converted or taken;

    (3)   The property held a value in excess of $5,000.00;

    (4)   The property was transported from one state to another state;

    (5)   The property was known by Defendant to be stolen, concealed, or taken.

The essential elements are the facts which must be true for Defendant to be guilty of the crimes charged.  Here, the facts which must be proved for Defendant to be found guilty of these two crimes are wholly separate and different.  Each crime requires proof of facts the other does not.  The counts are not multiplicious.  The motion to arrest judgment pursuant to Fed. R. Crim. P. 34 will be denied.

**Motion for New Trial**

Fed. R. Crim. P. 33(a) provides that: Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires.

Any alleged error in the trial that could be raised on appeal may be raised on a motion for new trial, and the motion may be granted if required in the interests of justice, i.e. if letting the verdict stand would result in a miscarriage of justice. Matters decided during the trial may be raised again in the Rule 33 motion.  In this order we have reviewed the significant claimed errors on account of rulings during the trial or as alleged otherwise in the motion and find nothing in any such claimed errors that would justify granting a new trial.

A motion for new trial on the ground that the verdict is contrary to the weight of the evidence is granted only in exceptional cases where the evidence preponderates heavily against the verdict.  The court is not required in the case of a Rule 33 motion for new trial to view the evidence in a light most favorable to the Government.  The power to grant a new trial is much broader than the power to grant a motion for judgment of acquittal under Rule 29.  The court is not obliged to view the evidence in a light most favorable to the verdict, and is free to weigh the evidence and evaluate for itself the credibility of the witnesses.  If the court concludes the evidence preponderates sufficiently against the verdict that a serious miscarriage of justice may have occurred, it may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.

The motion for new trial is more difficult to decide in this case because we conclude it requires the court to weigh the evidence and evaluate for itself the credibility of the witnesses. In our analysis below we reach certain conclusions as to what facts

were proved at trial.  These findings are made solely to enable the court to rule on the motion for a new trial and are not intended to extend beyond that purpose or to be binding with respect to issues to be faced in the future as the case progresses.  Defendant presented substantial evidence at trial which could have resulted in a defense verdict by the jury.  The trial was not a one-way street.  But in respect to a Rule 33 motion, we are to an extent and for that purpose only cast in the role of a fact finder.

We find this is not an exceptional case where the evidence preponderates sufficiently against the verdict that a serious miscarriage of justice resulted.  The verdict is not contrary to the weight of the evidence.

**IT IS, THEREFORE, HEREBY ORDERED** that Defendant's motion (#63) for judgment of acquittal, new trial, and arrest of judgment is **DENIED**.


### Essential Elements – Wire Fraud/
### Proof of False Representation Not Necessary

To prove wire fraud, the Government was not required to prove a false representation of a material fact (the elements of fraud).

The essential elements of wire fraud are:

(1)  A scheme to defraud;

(2)  Use of wire in furtherance of the scheme;

(3)  Specific intent to deceive or defraud.

The Government did not have to prove that Defendant made any particular, false statement of material fact to the Fergusons. Rather, the Government may, as it did here, prove a scheme or

artifice to defraud which may or may not involve false statements. U.S. v. Woods, 335 F.3d 993 (9th Cir. 2003).

The Government did not have to prove reasonable reliance by the Fergusons with respect to the statements or representations made to them by Defendant which were the basis for their making the four million dollar "investment". The jury did not have to find beyond a reasonable doubt that the Fergusons believed what they were told. While common law fraud might require such showing, wire fraud does not. Nevertheless, reliance was not necessarily out of bounds for the Fergusons who were looking for something, preferably a lot, for nothing or very little. The Fergusons took the bait largely because of their confidence in Defendant and in Mr. Koon who was Defendant's trustee. The evidence did not indicate that the Fergusons were experienced and savvy investors. They left their investments generally to their accountant except on this occasion. The common law requirement of justifiable reliance has no place in the federal crime of wire fraud. There is no basis to grant a new trial on this basis.

### The Trusts and Defendant's Other Activities

As a part of the artifice or scheme to defraud to convince the Fergusons and the interested public that his claims were on the up and up, Defendant established various trusts through Mr. Koon and his daughter, Nicole Koon, purportedly for charitable purposes. Charitable enterprises in the United States were supposedly the key to the repatriation of Defendant's claimed overseas assets. These trusts were all under the direct and strict control of Defendant.

The funding for them was to come from Defendant's claimed cache of overseas assets which he claimed he was seeking to repatriate. The trusts purported to engage in various business activities such as making offers for property, which never resulted in any sales transactions because there were no funds forthcoming to purchase the properties, and becoming involved with Adventurous Living which was supposedly involved in charitable enterprises in Southern California.

All of the trusts were formed by the same people at Defendant's direction. They were all subject to Defendant's direction generally through Mr. Koon. While they seem to operate independently of each other they all appeared to be part of the overall scheme.

Also the extensive and expensive re-landscaping of the Ferguson property by Defendant was likely meant to show Defendant's wealth and substance and therefore the likelihood his claims of his overseas assets and the investments needed to repatriate them were true. Witnesses for Defendant and for the Government also testified that Defendant had told them about his claimed hydroelectric ventures, his investment in coal fields in Wyoming, gold mines, and a resort in Venezuela. To the extent this evidence was elicited by defense counsel, it appeared to be an effort to convince the jury of the validity of the trusts and the overseas assets.

### The Fergusons' Involvement

The evidence does not support Defendant's claim that the Fergusons were involved in and authorized the subject transactions or that they were part of the scheme.  While they signed or had notice of papers on several occasions which enabled the scheme to go forward or which should have put them on notice of what was happening, their trust in Defendant and Mr. Koon was the reason they signed these papers and ignored information which should have put them on notice.  After all, their own money was used to purchase their own home from them; they lost four million dollars in their supposed investment.  It cannot be fairly concluded that they knowingly participated in this scenario.

Most of all the document which Mr. Ferguson signed and which authorized the transfer of the Fergusons' four million dollars from the Pasadena bank account to the Idaho Falls bank account where they had no control over the funds could hardly be considered a knowing, understanding, and voluntary act.

The $5,000.00 which was to be left in the Pasadena account undermines to some extent the claim that the Fergusons thought Defendant's supposed six million dollar contribution (never made) to the account was still there.  Still, the $5,000.00 balance to be retained in the Pasadena account was the creature of Defendant who inserted it in documents Mr. Ferguson signed foolishly, trusting in Defendant and Mr. Koon.

The Government claims the Fergusons were told that the account in Pasadena would have Defendant's supposed six million dollars in it in addition to their four million.  The record supports this

proposition that this was the case since it was represented to them along the way that the Fergusons were to contribute four million dollars to the charitable venture and that Defendant was to contribute six million.

The document which was the vehicle that transferred the four million dollars from the Pasadena bank account to the Idaho Falls bank account was, by the most credible evidence, dictated by Defendant to Nicole Koon and then signed by Mr. Ferguson.  Through that means Defendant was able to obtain control of the Fergusons' money.

## The Fergusons' Attorney Involvement

Nor does the involvement of the Fergusons' attorney in some of the transactions show that the Fergusons were part of the fraud which resulted in the loss of their own money.

The attorney was involved in the sale of the Ferguson home to the trust which Defendant controlled and in peripheral matters, but not in the "investment" of the four million dollars or the transfer of those funds which according to Defendant had to be kept secret, even from the Fergusons' attorney.

## Testimony of Lionel Koon

Lionel Koon's testimony is problematical.  At first he testified that he and the Fergusons knew the funds transferred from Pasadena to Idaho Falls were the Fergusons' money.  Then after a recess and a meeting with the United States Attorney and the F.B.I. Agent he came back on the witness stand and changed his testimony

to say he and Fergusons did not know the funds transferred were the Fergusons' money.

At best the court or the jury could believe one or the other of these versions, or choose to disbelieve Mr. Koon with respect to this issue.

After Mr. Koon first testified, the Government was permitted by the Rules to bring out what it thought to be the truth or could choose to impeach the witness.  By calling a witness the Government does not vouch for him.  The witness does not belong to the Government.  The Government must take the witnesses as they come, just as the defense does.

It doesn't make sense that the Fergusons knew that their own money was being used to purchase their own house and then to go through with the transaction as they did.  Nonetheless, at trial and now the Government has chosen to discount Mr. Koon's testimony and not rely upon it.

Mr. Koon's testimony one way or another does not provide a basis to grant a 29(c) acquittal or to grant a new trial.

## The Overseas Assets

The alleged overseas assets were material to the case. Defendant used the existence of these supposed assets as a basis to extract the Fergusons' investment.  Defendant claimed he could repatriate the overseas assets to the United States if parallel charitable ventures were undertaken within the United States.  The prosecution appeared to the court to challenge the existence of these overseas assets and that the claims respecting these assets

10

were part of the wire fraud scheme and artifice.  The defense was that the assets actually existed and that these representations by Defendant were true.  Witnesses were presented by Defendant to back up this claim.  The Government responded at the trial by offering rebuttal evidence to show the claims respecting the existence of these assets were false.  The rebuttal evidence was presented by a Secret Service Agent who presented testimony indicating the bills tendered by the defense witness, Mr. Santoro, which purportedly came from Defendant's overseas cache, were counterfeit.  This testimony raised grave questions as to the actual existence of the cache of foreign assets and provided support for Government's apparent claim that they did not exist and that Defendant's claims were false.

### **Secret Service Agent's Testimony**

The presentation of the testimony of the Secret Service Agent by the Government in the rebuttal case was proper and not unfairly prejudicial to Defendant.  The testimony supported the Government's claim that Defendant's representations as to the existence of the overseas assets were false.  The evidence was substantive in that respect and also impeaching with respect to witnesses presented by the defense in the defense case claiming that the overseas assets did exist and were genuine.

The Agent was subjected to extensive and effective cross examination, yet his doubts about the authenticity of the currency presented by Mr. Santoro stood up.  The evidence of toner in the claimed bills indicated they were likely counterfeit.  The defense

made good points respecting the witness qualifications and the nature of the bills, yet one came away with the impression the bills were counterfeit.

Nor could the defense claim surprise when the Agent appeared as a rebuttal witness after Mr. Santoro's testimony regarding the currency was presented.  The defense could reasonably and fairly anticipate that the rebuttal testimony would be offered.  The outstanding cross examination showed that in fact the defense anticipated such evidence and was well prepared to defend it on many bases.

The Agent exhibited sufficient qualifications (which were severely challenged in the cross examination) to express his opinion about the authenticity of the currency Mr. Santoro claimed came from the cache of overseas assets in the Philippine Islands. The presentation of Mr. Santoro's testimony squarely placed in issue the authenticity of this currency and the claim of the actual existence of the overseas assets.

Defendant was not entitled to receive any report of the Agent's findings in advance of his testimony.  The Rules only require such reports to be provided if the expert is to be presented in Government's case in chief.  The defense received the Agent's findings almost immediately after the Government did during the trial.

The fact that Mr. Santoro may have offered the bills to the Government for testing previously adds little to the mix. Defendant makes some excellent points about this testimony, but in the large it casts serious doubt whether the overseas assets did in

12

fact exist, and thus supported the Government's challenge as to whether they did or not.

The defense witnesses who supported Defendant's testimony with regard to the existence of the overseas assets were all either other hopeful investors in Defendant's scheme or victims of it, associates of Defendant, or [as in the case of Mr. Santoro] employed by him. Thus the testimony of the Secret Service Agent with respect to objective evidence that the currency Mr. Santoro claimed to have obtained from the Philippines cache of overseas assets was telling and properly received in evidence.

### Rebuttal Testimony Regarding Defendant's Presence on Three Occasions

In its rebuttal case, the Government presented witnesses to impeach Defendant's testimony:

(1)   That he was not on the scene and present at the Ferguson home at the time he was purporting to purchase it through the trust;

(2)   That Defendant was not at the bank on July 14 when the proceeds of the four million dollar transfer were divided up into cashier's checks to purchase the Ferguson home and Mr. Ferguson's helicopter; and

(3)   That Defendant was not at Smitty's Pancake House when the checks were written on July 17.

Defendant's contention is that Mr. Chasten's testimony is more reliable than the Government's rebuttal witnesses. However, considering the circumstances and for the purposes of deciding the motion for new trial, it appears to the court the rebuttal

13

witnesses' testimony is the more credible.  Each of these occasions was an important event in the sequence.  One would expect that Defendant would be present on each of these occasions, the purchase of a new, very expensive home for the Chasten family, the division and disbursement of the four million dollars of the Ferguson's money at the bank, and the payment of very substantial amounts of money through the checks which were prepared at Smitty's.

Not only does this evidence impeach Defendant's testimony to the contrary, but it establishes that Defendant was likely present at each of these significant events.  The presentation of this rebuttal testimony was by no means unfair.

## Count 2 of the Indictment

Count 2 of the Indictment charges receipt, possession, or concealment of stolen property that has crossed a state line in violation of 18 U.S.C. § 2315. The essential elements of this crime are:

(1)   Receiving, possessing, or concealing property;

(2)   The property was stolen or unlawfully converted or taken;

(3)   The property had a value in excess of $5,000.00;

(4)   The property was transported from one state to another; and

(5)   The property was known by the Defendant to be stolen, converted, or taken.

Here, perhaps the most difficult issue is "when" was the property stolen, converted, or taken.  For Defendant to be found guilty of the offense, the taking of the money had to occur before

the transfer from the Pasadena bank account to the Idaho Falls bank account.  We conclude that once Mr. Ferguson signed the written authority for transfer of the funds and that authorization was delivered to the Pasadena bank to make the transfer, the funds were for all intents and purposes taken.  At that point Defendant had control of the funds through his control of the Idaho Falls account and the Fergusons no longer controlled the funds.  The Defendant at that point knew the funds were in his control and that he had taken them.  In transferring the money from the Pasadena account, Defendant exercised rights of ownership to the exclusion of the Fergusons.

At the point the transfer document was delivered to the Pasadena bank to make the transfer to the Idaho Falls account, which was controlled by Defendant, we must conclude the money had been taken and that Defendant intended to permanently deprive the Fergusons of the ownership of the money.  At the very least by the time the bank initiated the transfer, the Fergusons had lost the money.  It had been taken without their consent.  After that the money did cross the state lines from California to Idaho.

### Testimony of the I.R.S. Agent

It is difficult to see how the testimony of the I.R.S. Agent about sham and facade trusts was unfairly prejudicial to Defendant or misled the jury.  While her expertise lies principally in the tax field, she had sufficient training and experience to assist the jury as to the nature of the trusts Defendant arranged to have created.  The defense was able through skillful cross examination

to point out the witness's lack of experience with respect to fraudulent trusts outside the tax field, and that she was mistaken in her testimony that the law trumped the terms of the trust instruments.

On a Rule 29 motion it was up to the jury to decide on the credibility of the witness.  On a Rule 33 motion, the presentation of this witness is not a basis to grant a new trial.

### Jury Instruction - Regarding Inferences

Defendant claims error in the alleged failure of the court to charge the jury that if there is a lawful and unlawful interpretation of Defendant's conduct, the jury was required to adopt the lawful explanation.

Defendant did not offer such an instruction.  However, the court proposed and then without objection gave Instruction No. 6 which instructed the jury that it may infer but is not required to infer, in the absence of evidence to the contrary that the law has been obeyed.  There was no error in our failure to instruct the jury as Defendant claims.

### Jury Instruction – Misrepresentation of a Future Matter

Defendant claims the court erred in its failure to charge the jury that one cannot misrepresent a future matter but only a present fact.

This instruction presented by Defendant was properly rejected. The proposition presented in the proposed instruction is irrelevant to the crime of wire fraud which does not require proof of any

particular misrepresentation.  Furthermore, the misrepresentation of a future matter can be a component of an artifice to defraud.

This claim of error is without merit.

## Claim of Jury Misconduct

The claim of jury misconduct is without merit.  There is no evidence to show that the jury reached a hurried verdict without properly considering the case and the court's instructions because they wanted to leave and complete their work before the weekend. These claims are pure speculation without any proper foundation. Attorneys and judges often underestimate the serious way in which jurors undertake their duties and the jurors' ability to perceive and understand the evidence and the case.  This jury was very alert, attentive, and interested in all phases of the case.  The relatively "brief" deliberation does not indicate the jurors were swayed by things other than the admitted evidence, or the claimed errors, or that they ignored the court's instructions.

## Claim of Prosecutorial Misconduct/Brady Claim

Defendant contends that a new trial should be granted because the court erred in not dismissing the case because of prosecutorial misconduct.  One of the claims in this respect that can be divined from the motion (#63) is the claim that the Government knew about the assets and money in the foreign cache and had received assistance from Defendant and Mr. Santoro, but no discovery was provided with respect to these matters.  This information allegedly was provided to the F.B.I. at Miami, Florida.  This claim was

17

rebutted by the Special Agent Hodges of the F.B.I. who testified that he received all documents provided to the F.B.I. in Florida and provided discovery of them to defense counsel.

The claim of failure to provide discovery was also rebutted by the testimony of Pamela Groves of the United States Attorney's Office who testified that all documents received by the office were, as documents or in the form of C.D.'s, sent to defense counsel.

One other claim of prosecutorial misconduct that can be divined from the motion itself is that the Government violated Brady by failing to disclose the Secret Service examination of the alleged currency presented to the jury by Mr. Santoro. As pointed out elsewhere in this order this information from the Secret Service Agent was received by defense counsel almost contemporaneously with its receipt by the Government. There was no Brady material. The information provided by the Secret Service Agent to the Government was by no means exculpatory to Defendant. The impeachment brought out by defense counsel in cross examination was, just that, impeaching. The fact that this cross examination casts doubts on the Agent's opinion does not constitute Brady material. Under Brady , the Government is not obligated to develop a scenario for impeaching a Government witness or to advise defense counsel where the weaknesses in the witness testimony might lie. The Government does not have to ferret out every conceivable basis for cross examining its witnesses and tip off defense counsel. In this case the techniques of cross examination used were standard, appropriate, and vigorous to challenge the knowledge of the witness

about the subject matter of his opinion.  There is no showing that the Government knew or should have known that these particular techniques might be used in cross examination or what information might be elicited, particularly, given the brief period Government counsel had to discuss the matter of the possible holes in his testimony with the witness before he testified in the rebuttal case.  In and of themselves the fruits of cross examination, testing a witness's credibility, and the foundation for his opinion, are not <u>Brady</u> material in any event.  The testimony of the Secret Service Agent was not the only evidence received by the jury on the issue of the claimed existence of the overseas assets.

We find no <u>Brady</u> violation by the Government.  In any event the impeachment developed in the cross examination did not rise to the level of material impeachment.  Examining the record as a whole, in the absence of the undisclosed bases for impeachments, Defendant received a fair trial, a trial resulting in a verdict worthy of confidence.  There was sufficient circumstantial and direct evidence to support the convictions.  Nor could it be concluded that there was conduct by the Government that so infected the trial with unfairness as to make the resulting conviction a denial of due process.  It is not more probable than not that any claimed misconduct of the Government affected the jury verdict or the fairness of the trial.

In its reply brief Defendant introduces for the first time in respect to the motion a whole additional litany of claimed Government misconduct.  The Government does not have the opportunity to respond to these claims and they may not be properly

19

urged in support of the motion at this stage and under these circumstances.

We, nonetheless, note that these claims are largely self serving and unsupported by credible, relevant evidence.  Defendant claims that the Government caused its apparent agents (1) to instruct Defendant to assemble his defense documents and to deliver them to agents in Florida; and prohibiting Defendant from retaining the originals or making copies.  There is no credible support for this claim.  The evidence at the trial indicated that Mr. Santoro was not a Government agent and never represented himself to Defendant as such. Defendant hired Mr. Santoro to assist him in the case.  (2) To instruct Defendant not to provide defensive documents or information to his attorneys or to inform them of his association with the Government; that Defendant actually assisted the Government; and that Government agents told Defendant if he assisted the Government he would be exonerated in this case.  These claims are by no means a basis for granting a judgment of acquittal or a new trial.  No substantial, credible evidence supports any of these claims of Government misconduct.

## **Motion for Continuances**

Defendant urges that he is entitled to a new trial because the court denied his motion for continuance of the trial.  This claim is without merit.  The trial had previously been continued four times over a period of approximately a year, largely on the basis of the claims of Government misconduct listed in the section of this order entitled, Claimed Prosecutorial Misconduct.  These

claims have never been substantiated by credible evidence and were
not a basis for continuance of the trial.

There is no basis to conclude that defense counsel did not
have time to adequately prepare for trial.  The excellent and
extensive presentation of the defense at trial belies that claim.
Defendant and defense counsel received adequate notice of trial, as
well as access to the materials they needed.  Defendant claimed he
set a deadline in advance of trial for the supposed Government
agents to exonerate him, as he stated they had promised to do.
That deadline passed so that Defendant by his own admission
thereafter had sufficient time to cooperate with his counsel and to
prepare for trial.

## **Miscellaneous Matters**

There are several miscellaneous matters which should be
addressed.

Jimmy Keller's activities do not appear to figure
substantially in the mix.  The evidence contains only passing
reference to him.  There was no substantial credible evidence to
indicate that Mr. Keller made false statements to the participants
which were part of or affected the scheme.  The evidence does not
indicate that the Fergusons would have any reason to believe that
the eight million dollars, which Mr. Keller supposedly stole from
the overseas cache of assets and which had supposedly been brought

/ / /

/ / /

/ / /

to the United States, would be in the Parkland Trust bank account
in Pasadena bank at the time the Fergusons' funds were transferred
to the Idaho Falls bank.

     Dated this _6th_ day of November, 2006.

                              _____
                              UNITED STATES DISTRICT JUDGE